UNITED STATES, Appellee

v

EDWARD HEILMAN, Private, U. S. Army, Appellant

12 USCMA 648, 31 CMR 234

No. 14,766

March 2, 1962

*Captain Ralph T. Smith* argued the cause for Appellant, Accused. With him on the brief were *Thomas C. Lancian, Esquire,* and *Lieutenant Colonel Ralph Herrod.*

*Captain William A. Zeigler* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy.*

Opinion of the Court

KILDAY, Judge:

The accused was tried by general court-martial for attempted premeditated murder, premeditated murder, and larceny, in violation of Articles 80, 118, and 121, Uniform Code of Military Justice, 10 USC §§ 880, 918, 648

and 921, respectively. He pleaded not guilty but was convicted as charged. He was sentenced to be put to death and to forfeit all pay and allowances. The convening authority approved the proceedings. A board of review, however, while affirming accused's convic-

tion for larceny, reduced the other findings to the lesser offenses of attempted unpremeditated murder and unpremeditated murder. The board affirmed so much of the sentence as provided for dishonorable discharge, total forfeitures, and confinement at hard labor for fifty years.

Thereafter, accused petitioned this Court for review, which was granted, and the case is before us upon a single assignment in which it is asserted that:

"PREJUDICIAL ERROR WAS COMMITTED BY THE ADMISSION INTO EVIDENCE OF THE TESTIMONY OF CAPTAIN MILLER THAT IN HIS OPINION THE APPELLANT WAS SANE."

In view of the limited grant of review, we find it necessary to set forth only such of the facts as are pertinent to a discussion of the single issue before us. They will be recited in connection with our discussion.

At the close of the accused's case, the defense having rested, trial counsel requested delay until the following day in order to secure the attendance of one Captain Miller, a psychiatrist. This request was favorably considered, and thereafter an out-of-court hearing was held. At that session the law officer sought to settle certain questions and to discuss the instructions. In the course of the hearing, the law officer stated to trial counsel:

". . . I suppose that if you think rebuttal is necessary you think we have some sort of an issue here that the Psychiatrist would know something about.

"Do you think that the defense evidence has raised an issue of the accused's insanity?"

To that inquiry trial counsel replied:

"Sir, I am certain that an attempt has been made to raise the issue. The only witness who really testified about it was the witness Gaines. I think the testimony was very weak, but I would not like to take a chance on letting the testimony stand without rebuttal."

We commend trial counsel for his abundance of caution in this connection. A review of the record indicates trial counsel was correct in his statement that only the named witness— one Private First Class Gaines—had given testimony which could possibly be construed as raising an issue of insanity. His testimony in that connection had been substantially as follows:

"Q Now, Gaines, what is your opinion of Heilman's general mental condition?

"A I think he's insane.

"Q You state that you think he is insane—what do you base this opinion on?

"A Well things he's done, like breaking windows with his hand, cutting himself with the razor. This night at the EM Club, he and Raut were drinking, just hitting each other, I think he's mentally unbalanced, anyone is who acts queer like that.

"Q You say that he's insane or mentally unbalanced?

"A Right.

"Q Were there any other acts that you can think of that make you think he's insane?

"A I haven't—no."

Thereafter, the law officer, by questions to the witness, developed that Gaines had a high school education and a year and a half of college; that at college he pursued a course in physical education; that in that course he studied "physical physique of the body and muscular system, . . . [but] no medicine"; that he was not a doctor; and that he was nineteen years of age.

From the content of Gaines' testimony and the manner of its delivery, it would appear as if the emphasis of his college course was placed more nearly on things physical than education.

When court opened the next morning, the prosecution offered as a witness, Captain David L. Miller, the doctor previously mentioned. He testified that at that time he was Staff Psychiatrist of an Army General Hospital;

that he had been performing those duties at the hospital for approximately two years; that he had four years of undergraduate training and a Bachelor of Arts degree; and that after four years of additional study, he was awarded a degree in medicine. After graduation, he pursued a two-year rotating internship, of which the last six months was devoted exclusively to psychiatry. Thereupon, he undertook a one-year residency in psychiatry, after which he entered the military service. And since entering the military service, he had been engaged exclusively with duty in the psychiatric field.

Dr. Miller testified he was a member of a psychiatric sanity board, of which another psychiatrist—one Major Allerton—and the case doctor—a Captain Pressman—who was responsible for the patient in the hospital, were the other members. He stated that at the board hearing the accused was given a warning under Article 31 of the Uniform Code, 10 USC § 831, and the same was explained in layman's terms. He further testified that in the course of the hearing by the board, various materials collected by the case doctor were presented, including psychologic test data, the clinical psychologic, electroencephalogram data, and biographical history of the patient prepared by the social worker and submitted in written form. Further, it was established that the board proceeding lasted somewhat longer than one hour, and that Dr. Miller had seen and participated in interviewing the accused for an hour during that period. Dr. Miller was asked if Dr. Pressman, as the case doctor, would not be the logical person to testify as to the accused. He replied that he thought, in terms of time of interview, Dr. Pressman would be perhaps more logical than himself. But he testified that, as a member of the board, he felt from that standpoint he was as qualified as the other two members.

Although he previously had acknowledged that Dr. Pressman had done the preliminary interviewing and had brought the facts thereof to the attention of the board, Dr. Miller responded in the affirmative when the following question was posed to him by trial counsel:

"Q Now, as a result of this hearing, did you, yourself, formulate your own opinion with respect to the mental condition of the accused?"

And when the law officer inquired into the subject further, this colloquy ensued between him and the witness:

"Q Let me rephrase my question. I think you indicated you have an opinion as to this man's mental condition, is that right?
"A That's true, sir.

.     .     .     .     .

"Q Captain, is the opinion you have based in whole or in part on data collected and reported to you by Captain Pressman?
"A It's based only in part upon that and part upon direct observation and questioning."

Thereafter, the transcript reflects the following answers by Dr. Miller to questions propounded by the prosecution:

"Q At the time of this examination or interview to which you referred, did you reach any conclusion as to whether or not the accused suffers from any mental disease, defect, or derangement?
"A I did, sir.

"Q What conclusion did you reach?
"A I reached the conclusion that he did not suffer from any disease, defect or derangement."

Subsequently, Dr. Miller enlarged upon his opinion in that regard, defining the terms he had used and stating his conclusion that at the time of the alleged offenses the accused was so far free from mental disease, defect, or derangement, as to be able, concerning the particular acts charged, to determine right from wrong. Further, he expressed his opinion that at the time of the alleged offenses the accused was so far free from mental disease, defect, or derangement, as to be able, concerning the particular acts

charged, to adhere to the right. He further testified that in his judgment the accused had the ability to premeditate, notwithstanding a characterologic defect; and that the accused had the mental capacity to understand the nature of the proceedings against him and to cooperate intelligently in his own defense. He stated that his opinion as to such capacity was based upon several factors. Talking with the accused himself and discovering what he felt to be an adequate understanding of what is right and wrong, the words and sentences he was able to use in the discussion they had, sentence structure, the way he used his grammar, and the way he handled himself, all indicated to Dr. Miller that the accused was of at least average intelligence, and that he was able to comprehend the questions asked him. And the results of the psychologic testing which he had seen confirmed the expert's conclusion that accused's general over-all intelligence was adequate and average.

Dr. Miller was asked if he should be told that it was reported that on one occasion the accused, after drinking, plunged his hand through a double glass window, whether this would affect his diagnosis or be at odds with anything he had said. Dr. Miller replied that it would not; that he would feel such manifestation of anger would fit with his diagnosis easily—that such is one of the qualities of this sort of diagnosis, to act impulsively with angry feelings. Dr. Miller further stated that the possible instance of engaging freely in fighting with another man, just for fun, would not affect his diagnosis.

Finally, we note Dr. Miller's answers to questions asked on redirect examination:

"Q As the result of your examination of this accused and your studies in connection with this case, are you convinced that he has no mental disease, defect or derangement?

"A I am convinced that this subject has no mental disease, defect or derangement.

"Q Is this your own opinion or that of some other doctor?

"A It is my own opinion."

At the trial, defense counsel objected to the receipt in evidence of the testimony of Dr. Miller, on the ground that his opinion was based upon data derived by another doctor and was, for that reason, inadmissible hearsay. That objection was overruled, and such action is the basis for the issue granted by this Court.

In its brief, the defense cites state authorities and texts to support their position, including the following: Underhill, Criminal Evidence, 5th ed, § 310; State v Gevrez, 61 Ariz 296, 148 P2d 829 (1944); Ingles v People, 90 Colo 51, 6 P2d 455 (1931); Flannagan v State, 106 Ga 109, 32 SE 80 (1898); People v Black, 367 Ill 209, 10 NE2d 801 (1937); State v Layton, 125 NJL 120, 14 A2d 771 (1940), affirmed 127 NJL 227, 21 A2d 732 (1941); People v Keough, 276 NY 141, 11 NE 2d 570 (1937); State v Frotten, 114 Vt 410, 46 A2d 921 (1946).

On the other hand, appellate counsel for the Government cite other authorities and texts to sustain the admissibility of such testimony notwithstanding the objection made by the defense. These authorities include: Carey v United States, 296 F2d 422 (CA DC Cir) (1961); Jenkins v United States, — F2d — (CA DC Cir) (October 26, 1961); District of Columbia Redev. L. A. v 61 Parcels of Land, 235 F2d 864 (CA DC Cir) (1956); G. & C. Merriam Co. v Syndicate Pub. Co., 207 Fed 515 (CA 2d Cir) (1913); Atchison, Topeka & Sante Fe Railway Co. v Preston, 257 F2d 933 (CA 10th Cir) (1958); H & H Supply Company v United States, 194 F2d 553 (CA 10th Cir) (1952); United States v Aluminum Co. of America, 35 F Supp 820 (SD NY) (1940); Blount County v Campbell, 268 Ala 598, 109 So 2d 678 (1959); Covina Union High Sch. Dist. of Los Angeles Co. v Jobe, 174 Cal App 2d 340, 345 P2d 78 (1959); People v Odmann, 160 Cal App 2d 693, 325 P2d 495 (1958); People v Brown, 49 Cal 2d 577, 320 P2d 5 (1958); Watts v Maryland, 223 Md 268, 164 A2d 334

(1960); State Tax Commission v Assessors of Springfield, 331 Mass 677, 122 NE2d 372 (1954); Davenport v Haskell, 293 Mass 454, 200 NE 409 (1936); National Bank of Commerce v City of New Bedford, 175 Mass 257, 56 NE 288 (1900); State v Ward, 10 Utah 2d 34, 347 P2d 865 (1959).

Boards of review have sustained the admissibility of the testimony of a psychiatrist under these circumstances in United States v Burke, 28 CMR 604, petition denied, 11 USCMA 783, 29 CMR 586; and United States v Davis, 10 CMR 429, petition denied, 3 USCMA 820, 11 CMR 248.

Also, attention should be given to the following provision of paragraph 138e, Manual for Courts-Martial, United States, 1951:

"Expert testimony may be adduced in several ways. *An expert witness may be asked to state his relevant opinion, when based on his personal observation* or on an examination or study conducted by him, without first specifying hypothetically in the question the data upon which the opinion is to be based." [Emphasis supplied.]

Concededly, there is a conflict of authorities as to the admissibility of testimony by a psychiatrist if such testimony is based in whole or in part upon information received by the psychiatrist from another. However, we do not find it necessary to attempt to settle that conflict. Nor is it necessary in the case at bar to determine whether the Government might permissibly have proceeded under that part of paragraph 138e, Manual for Courts-Martial, supra, dealing with a study conducted by the witness. See United States v Walker, 12 USCMA 658, 31 CMR 244, this day decided. We pretermit resolution of those matters until they are squarely presented in a proper case.

The record in this case reflects that Dr. Miller had formed his own conclusion as to the mental capacity of the accused through observation and conversations; and that his opinion was his own and not the opinion of another doctor. We do not have before us a case

in which a trained psychiatrist testifies regarding an accused's sanity even though he has not observed and interviewed him. Dr. Miller both observed and interviewed the accused and came to his own independent evaluation. As an expert witness, it was proper for him to state his expert conclusion.

True, it was developed that in connection with his inquiry into the case he had received information from others and at one point in his testimony stated his opinion was based in part on such other information. However, from other explicit statements by the witness and his whole testimony, it is quite clear that he had formed his own professional and expert opinion as to the mental condition of the accused. In this situation it was proper to permit Dr. Miller to give that opinion. The extent of his examination, his opportunities to observe the accused, the degree to which he was informed of accused's condition, and other matters in connection therewith were proper subjects of inquiry, on cross-examination, that the court might determine the weight to be given to his testimony. Defense counsel was given wide range in the inquiry and pursued the same ably and thoroughly. Such matters might bear on the weight to be given the doctor's testimony, but had no effect upon its admissibility. See United States v Walker, supra, and authorities there cited.

Some might feel that this record reflects a ridiculous situation. Private Gaines was properly permitted to state his lay opinion that accused was insane, but, thereafter, strenuous objection is made to the testimony of a highly qualified psychiatrist who observed and conversed with the accused. We regard the situation as reflecting the concern of our present system of military justice for an accused, rather than a ridiculous matter.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

With all respect, I am compelled to express my disagreement with my

652

brothers' conclusion that the record reveals no basis for excluding Captain Miller's expert opinion concerning accused's mental responsibility. Miller's testimony requires that I conclude his opinion was based upon hearsay and, thus, should have been stricken by the law officer upon the defense counsel's motion.

Tried by general court-martial, the accused was found guilty of attempted premeditated murder, in violation of Uniform Code of Military Justice, Article 80, 10 USC § 880; premeditated murder, in violation of Code, supra, Article 118, 10 USC § 918; and larceny of the murder weapon, in violation of Code, supra, Article 121, 10 USC § 921. He was sentenced to be put to death and to forfeit all pay and allowances. The convening authority approved the findings and the penalty. The board of review, however, reduced the findings of guilty to attempted unpremeditated murder, unpremeditated murder, and larceny, and affirmed only so much of the sentence as provided for dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for fifty years. We granted accused's petition for review on the contention:

"PREJUDICIAL ERROR WAS COMMITTED BY THE ADMISSION INTO EVIDENCE OF THE TESTIMONY OF CAPTAIN MILLER THAT IN HIS OPINION THE APPELLANT WAS SANE."

It is necessary to advert only briefly to the facts depicted in this record. Suffice it to say that it was clearly demonstrated the accused shot and wounded one Hahn and also shot and killed one Ehrstein, the latter event apparently occurring "accidentally" during the attempt to kill Hahn. The acts were accomplished with a stolen pistol and followed a breach in friendly relations between accused and Hahn. Some time previous to the shootings, accused had declared that "if he could not be friends with Hahn he would kill him."

A Private First Class Gaines testified that, in his opinion, Heilman was insane. He based his view upon certain acts of the accused committed prior to the offenses here involved, "like breaking windows with his hand, cutting himself with the razor . . . just hitting each other." To rebut the evidence of lack of mental responsibility thus adduced, the prosecution presented the testimony of Doctor David L. Miller, an Army medical officer and psychiatrist.

Defense counsel immediately interposed an objection to Dr. Miller's testimony, alleging in part that it was inadmissible because Miller's opinion concerning accused's sanity was largely based upon the views held by one Captain Pressman, the psychiatrist actually in charge of accused's examination, and facts gathered by others and related to him by Pressman. Before ruling on the objection, the law officer permitted preliminary development of the basis for Dr. Miller's ultimately disclosed opinion that accused was mentally responsible.

Miller testified that he had examined the accused only during his appearance before a board of medical officers on July 18, 1959. Also present were Major Allerton, another psychiatrist, and Captain Pressman, the "case doctor." Before entering the board hearings, Miller "had not familiarized" himself "formally with any of these materials" relating to Private Heilman's case. The standard procedure followed by Army psychiatric boards requires all pertinent data to be presented to the board after it is convened. The patient is then examined by the board members. With respect to the board's use of such data, Dr. Miller testified as follows:

"During the introductory portion of the Board all materials that had been gathered by the case doctor, Captain Pressman, were presented to us, psychologic test data was presented to us, the clinical psychologic, and the electro-encephlogram data was presented to us in the form of the usual report given by the Neurologist of the hospital, and the social history, which is a biographical history of the patient, was presented in written form by the Social Worker."

Accused's "case doctor," Captain Pressman, was the psychiatrist "responsible for the patient in the hospital." Under normal procedures, he would interview accused for a period of four to ten hours prior to the convening of the

board, or until "he feels confident that he knows enough to arrive at a decision." The case doctor "brings all these interviews before the Board and discusses" them with the other members prior to accused's appearance in the proceedings. Captain Pressman brought "these facts" to Dr. Miller's attention. Pressman, however, had "marked difficulty in speaking before groups" and, therefore, Dr. Miller appeared as an expert witness in his stead.

As a result of the board hearing, Miller formulated his "own opinion with respect to the mental condition of the accused." After the defense counsel reiterated his objection to the receipt of that opinion, the law officer inquired concerning its exact basis:

"Q Captain, is the opinion you have based in whole or in part on data collected and reported to you by Captain Pressman?

"A *It's based only in part upon that* and part upon direct observation and questioning." [Emphasis supplied.]

The defense objection was overruled, and Dr. Miller was permitted to testify that he considered the accused mentally responsible for the acts with which he was charged. However, he suffered from a "characterologic disorder" but for which he would not have committed these crimes. The cross-examination of the witness ended with the following colloquy:

"Q I believe you stated that you saw Private Heilman one time for approximately one hour. Is that correct?

"A That is true.

"Q And within one hour's time, you feel you can give a complete evaluation?

"A *I feel that I had sufficient data, information, and enough observation to arrive at a conclusion for this Board.*

"Q *And some of the data which you had was what Doctor Pressman had made available to the Board?*

"A *That is true, sir.*" [Emphasis supplied.]

The author of the principal opinion

concludes that Dr. Miller testified here only to his own conclusion concerning accused's mental responsibility which, in turn, was based upon observation and interview of the party most directly affected. With this dispositive pronouncement, I cannot agree. To me, the record clearly and unequivocally establishes that Miller's opinion, while personal, was based only in part upon the interview of the accused before the sanity board. He carefully and expressly stated it was also predicated upon Captain Pressman's discussion of his interviews with Heilman, reports of the results of psychological and neurological testing, information furnished by a social worker, and material furnished the doctors by the staff judge advocate's office. With the possible exception of the latter—apparently a summary of the circumstances surrounding this unfortunate incident—the record does not reflect proof of a single fact relating to these bases for Dr. Miller's opinion. Accordingly, I am unable to join with my brothers in their belief that the issue before us need not be resolved and I proceed to consider its merits.

The question which this record presents is simply whether an expert psychiatric witness may give in evidence his opinion concerning an accused's mental responsibility when the factual predicate for that opinion has not been proven. I suggest that the answer to this inquiry must be in the negative. The barrier which the law erects against the receipt of such opinion evidence has been repeatedly recognized both by distinguished commentators and the case law.

The proper rule is precisely stated in Underhill, Criminal Evidence, 5th ed, §§ 309, 310:

". . . *Expert opinion based upon hearsay testimony, or in part upon his understanding of the testimony of another expert witness, is properly excluded.*

". . . Expert witnesses shown to be qualified may give their opinion or conclusions *from facts observed by them, or within their knowledge and testified to by themselves, and supported either by facts or testimony of*

*other witnesses already given or to be given, or on facts derived partly from one source and partly from another,* and it is not always necessary that the facts be stated in an hypothetical question." [Emphasis supplied.]

Similarly, Wharton, Criminal Evidence, 12th ed, § 519, notes:

"The opinion of an expert may be based upon personal knowledge or observation. *Generally speaking, the opinion of a medical expert based upon information obtained out of court from third persons is inadmissible. The same rule is followed when the question is the sanity of the defendant.*" [Emphasis supplied.]

In like manner, the learned Dean Wigmore, perhaps the most persuasive American authority on the law of evidence, states:

"Thirdly, though hypothetical presentation is thus not universally necessary, it is certainly necessary (for the reason just noted) where the premises are not supplied by the witness himself. The premises must be brought out in some way. If the witness cannot himself supply them by details of his own observation, they must be presented hypothetically." [Wigmore, Evidence, 3d ed, § 676.]

And, he declares more specifically, in § 688:

"(4) As to *hearsay symptoms told by third persons,* a diagnosis based on sundry information from third persons in general has no claims for admission." [Emphasis supplied in part.]

See also Jones, Evidence, 5th ed, § 421; Greenleaf, Evidence, 16th ed, § 430 *l*; McKelvey, Evidence, 5th ed, § 189; 32 CJS, Evidence, §§ 518, 521; and 20 Am Jur, Evidence, §§ 787, 791.

The rule applied in the United States courts is the same as that set forth in the cited commentaries, *i.e.,* that expert opinion must be based either upon facts personally observed by the witness or otherwise placed in evidence. In United States v Faulkner, 35 Fed 730 (ND Tex) (1888), it was early said in connection with a medical expert's testimony regarding sanity, at page 732:

". . . [B]ut his opinions based in part at least on the representations made to him by . . . others prior to this trial, or any trial in this case, you cannot consider."

In McAdams v United States, 74 F2d 37 (CA 8th Cir) (1934), it was likewise stated, at page 41:

"Upon the retrial of this case, the court should confine the testimony of the witnesses for the government to matters which are within their own knowledge, and not permit them to testify, over objection, to what some one told them, or to give their opinions based upon hearsay."

And Circuit Judge Soper stated, in Gilbert v Gulf Oil Corporation, 175 F2d 705 (CA 4th Cir) (1949), at page 709:

". . . But in the exercise of this discretion, the court must still determine . . . whether the expert offered as a witness is qualified to express such an opinion, and whether he has sufficient acquaintance with the basic facts, either through personal observation or on the basis of a proper hypothetical question, to enable him to do so."

In United States v White, 124 F2d 181 (CA 2d Cir) (1941), the distinguished jurist Learned Hand declared, at page 186:

". . . It is of course necessary that at some stage and in some way it shall appear that the witness is basing his opinion only upon evidence in the case. . . ."

Finally, in Blunt v United States, 244 F2d 355 (CA DC Cir) (1957), Judge Bazelon exactly summarized the Federal rule, at page 364:

"As an expert witness, the psychiatrist is permitted to testify to his inferences from facts. His *opinions* are exactly what is sought. And these opinions may be based upon facts he has himself observed, or facts he has heard others relate [in court], or hypothetical facts presented to him."

It would be a work of supererogation

to discuss the many other decisions which have firmly held to the choice between personal knowledge and hypothetical incorporation of proven facts as the basis for expert opinion. The rule has been denominated "elementary." Greenberg v United States, 280 F2d 472 (CA 1st Cir) (1960). State jurisdictions have almost universally applied it. Stevens v State, 6 Ala App 6, 60 So 459 (1912); State v Gevrez, 61 Ariz 296, 148 P2d 829 (1944); Ingles v People, 90 Colo 51, 6 P2d 455 (1931); Flannagan v State, 106 Ga 109, 32 SE 80 (1898); People v Black, 367 Ill 209, 10 NE2d 801 (1937); Jackson v Commonwealth, 296 SW2d 472 (Kentucky) (1956); People v Keough, 276 NY 141, 11 NE2d 570 (1937); Commonwealth v Ballem, 386 Pa 20, 123 A2d 728 (1956); State v Hadley, 65 Utah 109, 234 Pac 940 (1925); State v Frotten, 114 Vt 410, 46 A2d 921 (1946); Annotations, 65 ALR 127, 51 ALR 2d 1051. And see 2 Morgan, *Basic Problems of Evidence,* American Law Institute, March 1954, and Maguire and Hahesy, *Requisite Proof of Basis for Expert Opinion,* 5 Vanderbilt Law Review 432 (1952).

Several of the foregoing decisions deal with facts precisely the same as those presented in this record. Thus, in Commonwealth v Ballem, supra, it was held that a psychiatrist might not base his opinion on a clinical psychologist's report not in evidence. In Ingles v People, supra, it was held to be reversible error to receive a physician's opinion on sanity which was based on information obtained from social workers and psychologists. And the same result obtained in People v Black, supra, when a psychiatrist's opinion was based in part on such sources. To the same effect is People v Keough, supra, and, indeed, it is worthy of note that one of the two jurisdictions in this nation which follow the most liberal rule regarding mental responsibility refuses to permit the introduction of psychiatrist's opinion based upon information obtained from his assistants which is not otherwise shown in evidence. State v Frotten, supra.

Despite the plethora of authority to the contrary, the Government nonetheless urges that Dr. Miller's opinion was admissible because the President has prescribed a rule of evidence for courts-martial which permits the receipt of expert opinion based on hearsay. That rule is said to be set forth in paragraph 138e, Manual for Courts-Martial, United States, 1951, as follows:

"Expert testimony may be adduced in several ways. An expert witness may be asked to state his relevant opinion, when based on his personal observation or on an examination or study conducted by him, without first specifying hypothetically in the question the data upon which the opinion is to be based. On direct or cross-examination he may be required to specify the data upon which his opinion is based, but if in the course of relating the data he refers to matters which, if themselves regarded as evidence in the case, would be inadmissible and might improperly influence the court, as when a psychiatrist testifies that his opinion as to the accused's mental responsibility was based in part on the past criminal record of the accused, the law officer (or the president of a special court-martial) should instruct the court in open session that such matters are to be considered only with respect to the weight to be given to the expert opinion. An expert witness may also be asked to express an opinion upon a hypothetical question (a question supposing a certain state of facts to exist) if the question is based on facts in evidence at the time the question is asked, or, if the court so permits in the exercise of a sound discretion, on facts which are later to be received in evidence. If evidence of such facts is not later introduced, the opinion based on them should be excluded."

Rather than to adopt a rule different from that applied in the civilian Federal courts, it would appear that the language of the quoted paragraph clearly provides for that standard. It unequivocally states that the expert "may be asked to state his relevant opinion, *when based on his personal observation or on an examination or study conducted by him.*" (Emphasis supplied.) Nowhere is reference made to materials collected by social workers and psychologists

which are not otherwise placed in evidence. To the contrary, it would seem that the entire tenor of the paragraph is to dictate either use of a hypothetical question based on facts in evidence or to permit the elimination of that device when the expert witness has based his opinion on personal observation of the facts or has studied reported facts and tests, which are otherwise proven, and has come to the conclusion to which he testifies.

This construction of the *Manual* regarding expert testimony is reinforced by reference to the discussion of its foundation in *Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951,* at page 213:

". . . The rule as to eliciting an expert's opinion without first asking him a hypothetical question is that set forth in Rule 409 of the American Law Institute's Model Code of Evidence."

Rule 409 of the Model Code of Evidence provides:

"Rule 409. OPINION WITHOUT PREVIOUS STATEMENT OF DATA.

"An expert witness may state his relevant inferences *from matters perceived by him or from evidence introduced at the trial and seen or heard by him* or from his special knowledge, skill, experience or training, whether or not any such inference embraces an ultimate issue to be decided by the trier of fact, and he may state his reasons for such inferences and need not, unless the judge so orders, first specify, as an hypothesis or otherwise, the data from which he draws them; but he may thereafter during his examination or cross-examination be required to specify those data." [Emphasis supplied.] [American Law Institute, Model Code of Evidence, 1942, page 210.]

It will be seen from the foregoing that the purpose of the Manual rule and Rule 409 of the Model Code is simply to eliminate the positive requirement of a hypothetical question as a prerequisite to giving an expert opinion. The principle that the expert's view must be based up-

on "matters perceived by him or . . . evidence introduced at the trial and seen or heard by him" is expressly included in the Model Rule and appears equally embedded in its restatement in the Manual, supra. Thus, not only does the Manual not adopt a view at odds with that applied in the United States courts, but it affirmatively requires the production *in evidence* of the basis for the expert's opinion. See Department of the Army Pamphlet No. 27–172, Military Justice, Evidence, January 1961, pages 42, 43.

It is not difficult to perceive the reason for this desirable limitation. Information furnished the psychiatric expert outside the courtroom and never produced in evidence is quite obviously hearsay. If such is used, the accused is denied his opportunity to test its trustworthiness by cross-examination of those who furnished the data to the psychiatrist. Thus, he cannot determine the expertise of the neurologist who furnished Dr. Miller with electroencephalographic test results; he cannot inquire directly into the findings of the physician who found Heilman physically fit; he cannot examine the qualifications or methods of the psychologist whose tests are said to support an opinion of responsibility; and he certainly is at a loss to find out the extent and effort to which an unnamed social worker went in providing the background information which psychiatrists deem so important in formulating their diagnoses. Moreover, there is no way in which he can examine the social worker's sources concerning bias or credibility.

It is no answer to say that accused may cross-examine the expert who is before the court and thus demonstrate the lack of weight to be attached to his opinion because of its dependence upon factors outside the record. Such a contention quite overlooks the right of the accused to cross-examine those who furnished the data concerning their motives, bias, qualifications, and methods. The psychiatrist can do little more than to state that he has confidence in his assistants, but he cannot even state that with respect to the social worker's sources of information. That is a quite inadequate substitute for probing into

the activities of those who actually performed needed tests and interviews and furnished necessary factual information.

In short, the rule against receiving expert opinion based on facts not in evidence is founded upon the need for trustworthiness. Without such facts, the accused cannot adequately demonstrate the opinion's invalidity to the jury, and the jury cannot properly weigh the opinion's worth in light of the evidence. See Maguire and Hahesy, supra. Psychiatric opinion frequently differs, and it is not unusual to see a "battle of experts" occur in criminal trials wherein, as here, the only real issue is mental responsibility. That the fact finders must be furnished with the predicate for the expert's views is clearly the rule in the Federal courts and most state jurisdictions. As it is the rule of reason, and has been adopted by the President for use in courts-martial, I suggest it should be unequivocally applied here.

I would reverse the decision of the board of review and authorize a rehearing.