UNITED STATES, Appellee

v

FARREL M. WALKER, Specialist Five, U. S. Army, Appellant

12 USCMA 658, 31 CMR 244

No. 15,011

March 2, 1962

*First Lieutenant Thomas Stapleton* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph Herrod.*

*Captain Barry L. Kroll* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy.*

## Opinion of the Court

KILDAY, Judge:

A general court-martial convened in Germany found accused guilty of assault with intent to commit rape, in violation of Article 134 of the Uniform Code of Military Justice, 10 USC § 934. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for five years, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and thereafter a board of review affirmed.

This Court granted accused's petition

for review to consider a single assignment of error couched in the following language:

"CAPTAIN WEISBLATT GAVE HIS OPINION AND TESTIFIED TO THE RESULTS OF AN ELECTROENCEPHALOGRAPH ON THE ACCUSED WHICH WAS NEVER PERFORMED BY HIM, NEVER SEEN BY HIM, IN FACT AN ELECTROENCEPHALOGRAPH WHICH HE WAS ADMITTEDLY INCAPABLE OF EVEN UNDERSTANDING. THE LAW OFFICER ERRED TO THE PREJUDICE OF THE ACCUSED IN FAILING TO INSTRUCT THE COURT TO COMPLETELY DISREGARD THE TESTIMONY OF CAPTAIN WEISBLATT."

The Government responds to this assertion with the contention, among others, that the testimony of Captain Weisblatt, an Army psychiatrist, as to his opinion of the mental state of the accused was based on his interviews and treatments of the accused, and as such was properly admitted into evidence.

We shall state only such of the circumstances as are necessary to a decision of the limited issue before us.

On May 25, 1960, accused was arraigned before a general court-martial on the instant charges but, before a plea was entered and at the request of individual defense counsel, the proceedings were continued until June 3, 1960. The reason for the continuance, as stated by the defense, was that it was deemed necessary to consult an expert in the area of epilepsy and certain other allied fields.

In the course of the defense case, Dr. Richard Wolf, a neurologist, was called as a witness for accused. After relating his professional and expert qualifications—which include fourteen years at the University of Frankfurt as a professor in neurology—he testified that on Monday and Tuesday of the week of the trial he examined the accused. During the examination he had a discussion with him about the incident in question, which occurred on the evening of February 29, 1960. As a result of his conversations and his examination, the doctor had reached conclusions regarding accused's state of mind on the evening on which the inci-

dent allegedly took place. In the witness' judgment, accused was in ill condition with a loss of consciousness, or absence of consciousness, with automatic reactions. In such condition, he stated, it would be possible for a man to remain mobile and yet lose consciousness for a period of six or seven hours; and, he concluded, based upon his observations, that is what happened to the accused on the evening in question.

Dr. Wolf stated that in his opinion, based upon all the factors in the case and medical records about the accused, which he had examined, the latter was suffering from pathological intoxication on the evening of February 29th, and was not responsible for his actions.

After direct and cross-examination had terminated, the law officer propounded certain questions to Dr. Wolf, eliciting the fact that there must be something wrong with an individual other than the fact that he had been drinking, before the condition of "pathological intoxication" will be found. Such condition is observed "almost only in cases of epilepsy heredity and to a large extent they are similar to epileptic seizures or fits." Further, it was determined that Dr. Wolf had subjected the accused to electroencephalographic tests, and the same "produced forms of disrhythm." While "this is actually no proof, . . . [it] is found frequently with epileptics" and, specifically, it was found on the electroencephalograph of accused. The doctor also testified that indulgence in intoxicants will trigger this state and, while it is possible to have the condition without taking of alcohol, that rarely happens and such stages are called "episodic." In response to the law officer's inquiry whether a person in such abnormal state has any control over his mental faculties, Dr. Wolf answered in the negative. And when the law officer asked:

"I gather then from such a condition, he is not able to tell the difference from right and wrong, is that correct?"

the defense psychiatrist responded:

"Yes, that's right."

Thereafter, Captain Sanford A. Weisblatt took the stand as a rebuttal witness for the prosecution. He testified that he was a medical doctor and psychiatrist. His college training was received at Stanford University and the University of Washington, and his medical schooling at the University of Oregon. He took his internship and internal medicine training at Indianapolis General Hospital, and received psychiatric training at the University of Washington. Since February of 1958, the witness stated, he had been serving as a psychiatrist in an Army general hospital.

In the month of April 1960, Dr. Weisblatt was assigned as the doctor for the treatment and observation of accused. He initially interviewed the accused on an outpatient basis and ordered an electroencephalogram and skull X-rays. A few days later when these were obtained he again saw accused as an outpatient. At that time it was deemed advisable to admit accused to the hospital for clinical psychological testing and additional interviews, which was accomplished.

Dr. Weisblatt stated his opinion:

". . . that the accused was not suffering . . . from a mental disease, defect, or derangement, which might have impaired his legal responsibility."

The doctor discussed at length the manner in which he arrived at his opinion by ruling out the presence of dissociative reaction and psychomotor epilepsy. Accused had claimed amnesia, and the foregoing are the two most common causes of amnesic episodes. According to the witness, in the case of accused, the kinds of temporal brain wave activity which are seen in instances of valid psychomotor epilepsy were not found on the electroencephalographic picture. The Government's psychiatrist then took up the subject of pathological intoxication, at which juncture the defense questioned the basis of his testimony. Dr. Weisblatt emphasized that the determinations were in his field; that he gave his opinion based on his training and reading. At this point individual defense coun-

sel inquired, "Is this the Doctor's opinion or is this the reporting of the opinions of others?" to which the law officer responded, "He stated that his opinions are based on his training and reading," and permitted the witness to continue his testimony. After lengthy testimony by Dr. Weisblatt as to pathological intoxication, interviews and observation of the accused, the latter's condition upon admission to the dispensary on the evening of the alleged offense and injections and treatments then given him, the following questions were propounded to the witness, and these answers elicited:

"Q. Doctor, based on your interviews and treatments of the accused, can you give the court an opinion at this time, as to whether on the date of the offense, 29 February 1960, if the accused had the ability to formulate a specific intent?

"A. It is my opinion, we have found nothing which could have impaired his capacity to formulate intent.

"Q. Did you find any mental defects, derangements, or diseases in the accused?

"A. We found no mental defects, disease, or derangements in the accused.

"Q. Based on your opinion, was the accused able to distinguish between right and wrong at the time of the offense?

"A. Again, if I might answer this in my own way, it is a little bit too much godliness to say if he was or wasn't. All I can say is that we found nothing which would lead us to believe he could not have known the difference between right and wrong.

"Q. And did you find anything to indicate that he could not be able to adhere to the right if he had wanted?

"A. We found nothing that would have impaired this ability to adhere to the right."

On cross-examination Dr. Weisblatt was subjected to a number of questions as to the length of his experience as compared with that of the defense wit-

660

ness, Dr. Wolf; his acceptance of the theory of pathological intoxication; his view that the same constitutes a misnomer; and as to whether his testimony was in conflict with that of Dr. Wolf. The fact developed that Dr. Weisblatt did not himself read the electroencephalogram.

Thereupon, individual defense counsel stated, "I ask at this time that any statements made by this Doctor as conclusions reached by another be stricken from the record." And, when the law officer made inquiry as to which statements he referred, counsel for accused responded, "Conclusions regarding the electro-encephalogram. I was unaware of this."

At this point trial counsel inquired of his witness, "Doctor, was this electro-encephalogram result used in the determination of the accused's sanity or mental condition?" In answer, the psychiatrist indicated it was used "with reference to trying to rule in or rule out the possibility of psychomotor epilepsy, which I mentioned before to the court was pertinent to our ultimate findings."

The law officer ruled on the request to strike a portion of Dr. Weisblatt's testimony in the following language:

"Well, the facts have been brought out to the court. It only goes to the weight. It is apparent that the Doctor, in giving his opinion, must base it on other things—other examination by other people. The fact that this was done by somebody else, the court will certainly take into consideration the weight to be given."

It is evident no motion was ever made that the law officer "instruct the court to completely disregard the testimony of Captain Weisblatt." The request was that statements made by the doctor as conclusions reached by others be stricken from the record. Specifically, these were denominated "Conclusions regarding the electro-encephalogram." The granted issue is, therefore, based upon an allegation of error as to which no express motion or objection was made at the trial.

However, had such a motion been made the law officer would not have erred by refusing to grant the same. We also conclude the law officer's action in overruling the motion to strike a portion of Captain Weisblatt's testimony was not improper. He correctly held the questions raised affected the weight to be given to the evidence and not its admissibility.

This is especially true in the light of the following testimony contained in the record. As heretofore stated, Captain Weisblatt was assigned as the doctor in charge of accused's case. He stated he had interviewed the accused four or five times and, in addition, served as a member of the psychiatric board which considered the case. The board consideration consumed an hour and a half; the duration of both his first interview and one of those subsequent was somewhere between half an hour and fifty minutes; and the others consumed from ten to fifteen minutes each. More importantly, the witness testified:

"We take, in general, as long as we feel we need. Had we felt that we would have learned more that would have been pertinent to the situation by taking more time, we would have done so. Under the circumstances, I felt that I had sufficient information, and I know of no other guide with regard to these kinds of interview than your own feeling that this is enough.

. . . . .

". . . I think generally we take upon ourselves, in instances where a man is facing general court-martial, the obligation of taking sufficient time, regardless of how long this makes the hospitalization. This is, we feel, more consequential than many of the other things that we do, so if we feel we need several weeks, we take it."

In summary of his expert conclusions regarding accused, Dr. Weisblatt gave an unequivocal affirmative answer to the following question:

"In other words, state this simply, when you examined the man in April, is it your testimony that on that day

you found nothing on that day which would lead you to believe that on the 29th of February there was something mentally wrong with this person?"

As in United States v Heilman, 12 USCMA 648, 31 CMR 234, this day decided, appellate defense counsel cite texts and civilian authorities which they contend render inadmissible the testimony of an expert witness based in whole or in part upon information received from others. On the other hand, counsel for the Government strongly assert the contrary position. We have given careful consideration to the respective arguments and the respectable authorities mustered in support thereof. And we are not unmindful of the following provision of paragraph 138e, Manual for Courts-Martial, United States 1951:

"Expert testimony may be adduced in several ways. *An expert witness may be asked to state his relevant opinion, when based on his personal observation* or on an examination or study conducted by him, without first specifying hypothetically in the question the data upon which the opinion is to be based." [Emphasis supplied.]

We do not find it necessary, however, to attempt a reconciliation of the admitted conflict between authorities cited by respective counsel. Neither do we find it necessary to determine whether the prosecution might have proceeded under that portion of paragraph 138e of the Manual, supra, having to do with a study conducted by the witness. Clearly, Dr. Weisblatt had both observed and examined the accused for such a period of time as was required to provide "sufficient information," upon which to predicate his own personal expert evaluation.

This trial, like all others under the Anglo-Saxon system was an adversary proceeding. The accused presented a German neurologist, and the Government presented a United States Army psychiatrist. Each side proceeded to bolster its own witness and, by cross-examination, to tear down or lessen the weight to be given to the testimony of the opposing expert. During this process accused developed that the electroencephalographic test was not given nor read by Dr. Weisblatt. However, the witness testified such test was used for a limited purpose only and detailed the extent thereof. More importantly, the Army psychiatrist had previously testified that, based upon *his interviews and treatments of accused,* he concluded accused could formulate intent; that he had no defects, derangements, or diseases; that he was able to distinguish between right and wrong; and that he could adhere to the right. This testimony made no reference to an electroencephalogram but was specifically related to the witness' interviews and treatments of accused. Again, the Government expert testified that when he examined the accused in April he found nothing "on that day" which would lead him to believe that on the 29th of February there was anything mentally wrong with accused. Conceivably this was before the electroencephalogram had been made.

We have before us a case in which each side produced an expert witness, both of whom based their testimony on interviews with and examinations of the accused. They came to opposite conclusions. Clearly such conflict is to be settled by the court-martial. All matters in connection with the respective examinations could be considered by the court in determining the weight to be given to the evidence of each witness. The nature, extent, and quality of each examination, as well as any contradictions or inconsistencies, were available to the triers of fact for that purpose. The law officer allowed full opportunity to pursue these matters and expressly ruled that all of them were before the court members to be used in determining the weight to be given to the evidence.

Upon the whole record in this case we hold that the witness, Captain Weisblatt, having personally observed and examined the accused, was qualified to state his relevant opinion. It was not error for the law officer to admit the same into evidence nor was it error to the prejudice of the accused for the law officer to fail to instruct the court

to completely disregard those expert conclusions. See paragraph 138e, Manual for Courts-Martial, supra; Wigmore, Evidence, 3d ed, §§ 672–686; 32 CJS, Evidence, § 550; Blunt v United States, 244 F2d 355 (CA DC Cir) (1957); United States v Heilman, supra.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

I regret that, as in United States v Heilman, 12 USCMA 648, 31 CMR 234, this day decided, I must disagree with my brothers' conclusion that it is unnecessary to reach the issue upon which we granted accused's petition for review. It seems clear to me that this record solidly presents a controversy between two highly qualified expert witnesses on a vital issue—the mental responsibility of the accused—and that, with regard to a decisive point, the Government's psychiatrist was permitted to testify to an opinion based upon an electroencephalogram which had been interpreted for him by another expert and which he could not himself read.

The accused was found guilty of assault with intent to commit rape, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934, and sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for five years, and reduction to the lowest enlisted grade. The findings and sentence have been affirmed. In view of the issue, it is not necessary to refer to the sordid facts recounted in the transcript other than to note that the offense occurred in a darkened alley and there was evidence that accused was severely intoxicated.

At the trial, Dr. Richard Wolf appeared on behalf of the defense. After being qualified as an expert, he testified that he had examined the accused. On the basis of this examination, a stipulation concerning accused's physical condition, and hypothetically stated facts, he expressed the view that, at the time of the offense, accused "was in ill condition with a loss of consciousness, or absence of consciousness, with automatic reactions." In Dr. Wolf's opinion, accused was not responsible for the offense with which he was charged, as he suffered from a state of pathological intoxication. Following cross-examination, the questions put to the witness by the law officer clarified his former testimony and demonstrated the exact nature and basis of the diagnosis:

"Questions by the Law Officer:

"LO: Doctor, I gather that the term you give his condition is 'pathological intoxication', is that correct?

"DOCTOR WOLF: May I speak in English?

"LAW OFFICER: You may testify in English if you can.

"DOCTOR WOLF: Pathological intoxication is not the same. Pathological intoxication is not quite the same as the German daemmerzustand. Daemmerzustand would mean its a state of unconsciousness who is a man near dreaming. He does not really dream, but he has a state of dreaming and he is therefore, I say, automatic actions. He is a person acting, but he does not know what he will or doesn't know what—he is not able to plan something and therefore, he is in a form of dreaming stage. That is the special form of unconsciousness, but daemmerzustand in alcohol intoxication is therefore pathological because this state comes suddenly and is therefore— he comes in a state wherefore he forgets all what he do. He is not in such case responsible what he did there— he is not responsible for what he is doing. That is in all such cases, in Germany or French, England and Norway, because this state comes suddenly and a person is not—not self-control. That is not the same in ordinary state of intoxication—alcohol intoxication. This form of intoxication increases slowly—it becomes slowly—it comes slowly to the state of effectiveness, but the pathological alcohol intoxication is quite so normal and then suddenly the per-

**663**

son—ordinary, slowly increases and therefore they say such persons have no possibility of self-control and therefore they are not responsible for their doings.

"Do you understand?

"LAW OFFICER: In other words, pathological intoxication, before you can have that, you have to have something wrong with the individual, other than the fact he has been drinking, is that correct?

"DOCTOR WOLF: Yes. *These conditions that you observe, almost only in cases of epilepsy heredity and to a large extent they are similar to epileptic seizures or fits.* I have made a record of each sheet and I have found here that the potentials of brain are slowly, more slowly, than normal—more slowly than some forms of pathological judgment.

"LAW OFFICER: Now, those sheets that you refer to, are they of the accused or just in general?
"A: (Interpreter) I have made those of Mr. Walker.

"LO: And does your 'EKG' show a pattern with Mr. Walker that would go along with this opinion of yours?
"A: 'EEG,' not 'EKG'. This form of 'EEG' produced forms of disrhythm and this is actually no proof, but is found frequently with epileptics.

"Q: Was it found on the 'EEG' of Specialist Walker?
"A. Yes.

"Q: As I understand it, the taking of intoxicants will set this condition off, is that correct?
"A: Yes.

"Q: Is it possible to have this condition without the taking of alcohol?
"A: This very, rarely happens, but is possible. We call these stages 'episodic'.

"Q: A person who is in this state, does he have any control over his mental faculties?
"A: In such an abnormal condition?
"Q: Yes.
"A: No.

"Q: I gather then from such a condition, he is not able to tell the difference from right and wrong, is that correct?
"A: Yes, that's right.

"Q: Is there any—are there any degrees to this condition? Can, on some ocassions [sic], a person be in sort of a haze, but still have some knowledge of what he is doing?
"A: No, and in this condition, it is everything or nothing. The difference is only a time period." [Emphasis supplied.]

In addition, Dr. Wolf testified that accused was left-handed, a frequently appearing characteristic of persons with a history of epilepsy.

In rebuttal, the prosecution adduced the testimony of Dr. Sanford Weisblatt, also an eminently qualified alienist. Concerning the scope of his examination, he noted that accused had stated that he was amnesic with respect to the incident giving rise to the charges. He then testified:

". . . In instances, where a patient alleges amnesia, one must take steps to attempt to rule out, as best one can, the known medical and psychiatric causes for amnesia. *With this in mind, I ordered an electroencephalogram and skull x-rays on an out-patient basis.* A few days later, when these were obtained, I re-interviewed him on an out-patient basis, and at that time felt it would be wise to admit him to the hospital for further interviews and clinical psychological testing." [Emphasis supplied.]

In addition, Dr. Weisblatt was questioned concerning the possible existence of a state of pathological intoxication on accused's part:

"TC: In your interviews and examinations, did you at any time consider a condition known as *pathological intoxication?*
"A: Yes.

"Q: *Would you tell the court what opinions you have formed as to that condition?*

"A: I think that this will clear this up and will help the court understand how we proceed. *The second entity, which I have mentioned before, that of psychomotor epilepsy, became a possibility—becomes a possibility always in situations like this, even more so in the situation of the accused because he had stated his mother had had epilepsy.* We know that patients who have epilepsy in their family are somewhat more likely than other people to have epilepsy. *Establishing this diagnosis requires not only a compatible history of observed behavior, which might occur with this condition, but also a characteristic electro-encephalographic picture.* In the instance of Specialist Walker, the kinds of temporal brain wave activity, which are seen in instances of valid psychomotor epilepsy, were not found. We know that these can be missed if a drousy [sic] tracing is not obtained. For example, with a wake record, without any sleeping, or any electrical activity evidencing drowsyness [sic], it is possible to miss this. *So, in conjunction with the Staff Neurologist, we went back over the tracing, to satisfy ourselves that there were adequate periods of drowsyness [sic] and whether there were temporal lobe spikes or not, on the tracing. There were none. We then dismissed this as a second possibility.* The condition of pathological intoxication is one that is confused and disputed. Generally, what is meant by this, so far as my understanding goes, is a situation—

. . . . .

"A: What is meant by this term is this: when an individual, after taking a very minimal amount of alcohol, behaves inappropriately for him, this is called pathological intoxication. In order to establish this as an entity, one must first establish the minimal amount of alcohol, that amount which would not ordinarily affect a normal person to any significant degree, affected the individual involved to a very striking degree. It is common, if I may speak this way, to talk of people who just can't drink; that one

'wiff' [sic] of alcohol and they aren't themselves. This is what is intended by this term. People who behave in a manner not consonant or not appropriate to their normal behavior following very minimal amounts of alcohol. In Specialist Walker's case, it seems apparent from his description of his behavior, his activities, during the afternoon preceeding [sic] this alleged act, that he had probably had eight to ten beers. This being the case, the possibility of pathological intoxication, namely, an excessive response to a very minimum amount of alcohol, is ruled out. Eight to ten beers is not the minimum kind of alcohol that is intended by this term." [Emphasis supplied.]

During cross-examination, the prosecution expert admitted that he, as a psychiatrist, did not believe in the term "pathological intoxication," because of "the implication that the name carries with it." He admitted that a possibility of its presence "could certainly exist" in the sense "of creating a state of unconsciousness due not only to a small amount of liquor but also due to a number of other factors." Further questioning elicited the following information:

"Q The activity as recorded on Dr. Wolf's electro-encephalogram, indicated that it was the type of activity commonly found in epileptics. Now, I take it that this electro-encephalograph that you performed reached a different conclusion?
"A Yes

"Q You are in no way suggesting that Dr. Wolf could have performed a test and not reached his conclusions validly merely because your test came off the other way, I take it?
"A I have done no suggesting—

"Q No, I say you are not suggesting.
"A Might I perhaps give a word of clarification?

"Q Go ahead.
"A With regard to the reading of electro-encephalograms, there are always some differences of opinion. There exists certain patterns which

are commonly recognized by competent people throughout the world as meaning something—something rather definite and clear-cut. *There are other patterns which would be read by one relatively competent neurologist as probably normal, another as borderline, another as probably abnormal—the same tracing. All of these men could be competent. In general, the kind of epilepsy which is pertinent to what we are considering today—psychomotor seizures—is reflected by relatively clear-cut electroencephalographic findings having reference to a certain part of the brain. Now, though it is possible that Dr. Wolf's tracing showed evidences of activity in this part of the brain, I would think it unlikely.* I can't deny that this was the case and certainly don't intend to. Just that we didn't see it. That is all I can say.

. . . . .

"A *With regard to this particular tracing, I myself did not read it.*

"Q Which one?

"A The one taken at our hospital. *I didn't read it, and I don't consider myself qualified to do so. It was read by our hospital Staff Neurologist, who I feel is quite competent to do so.*

"INDIV COUNSEL: I ask at this time that any statements made—

"A I can tell you—

"INDIV COUNSEL: I ask at this time that any statements made by this Doctor as conclusions reached by another be stricken from the record.

"LAW OFFICER: What statements do you have reference to?

"INDIV COUNSEL: Conclusions regarding the electro-encephalogram. I was unaware of this.

"LAW OFFICER: Trial counsel?

"TRIAL COUNSEL: Doctor, was this electro-encephalogram result used in the determination of the accused's sanity or mental condition?

"WITNESS: *It was used with reference to trying to rule in or rule out the possibility of psychomotor epilepsy, which I mentioned before to*

*the court was pertinent to our ultimate findings.*

"TRIAL COUNSEL: *Was it used by the board of officers you were a member of?*

"WITNESS: *It was.*

"LAW OFFICER: Well, the facts have been brought out to the court. It only goes to the weight. It is apparent that the Doctor, in giving his opinion, must base it on other things —other examination by other people. The fact that this was done by somebody else, the court will certainly take into consideration the weight to be given." [Emphasis supplied.]

From the foregoing, it would appear that the major difference in much of the two experts' testimony was semantical. Dr. Wolf spoke in terms of the accused being pathologically intoxicated. Dr. Weisblatt, expressing disbelief in some of the effects of intoxication, *per se*, preferred to refer to the condition as psychomotor epilepsy. The important fact, however, is that—regardless of nomenclature—he excluded the existence of the condition by relying on a report to him by another person concerning the interpretation of an electroencephalogram recording the pattern of electrical discharges in the accused's brain. On the other hand, Dr. Wolf's contrary diagnosis was premised upon his personal recording and interpretation of an electroencephalogram. In short, accused's whole defense of insanity turned largely upon the proper expert conclusions being drawn from the two electroencephalographic studies. Nonetheless, Weisblatt was permitted to exclude the possibility of support for Dr. Wolf's opinion by reliance exclusively upon the interpretation given him by a witness never called to testify. In short, the critical part of his views was based upon hearsay to which prompt objection was made.

I emphasize the foregoing matters to demonstrate the pertinency of the hearsay to the narrow issue before the court-martial. The defense expert testified to a particular and unusual sort of psychic seizure. Dr. Weisblatt ex-

cluded the possibility of this illness by testifying that, in another doctor's opinion, accused's electroencephalogram was normal. In light of his testimony, and quite regardless of his interviews of the accused and other testing, a foundation was neatly provided for the ultimate rejection of the accused's defense. Accordingly, I am convinced we should reach and decide the question whether the law officer should have stricken Weisblatt's hearsay declarations regarding the results of the electroencephalographic examination and his consequent exclusion of the existence of pathological intoxication.

Having reached the issue, I would, for the reasons which I have extensively set forth in my opinion in United States v Heilman, supra, hold that the law officer erred prejudicially in denying the defense motion to strike. The rule which I deem applicable is simply that psychiatric opinions must be based upon evidence properly presented in the record of the trial in which the expert witness testifies. If such expert opinions are based, in whole or in part, upon hearsay, they cannot be received. I would, therefore, reverse the decision of the board of review and order a rehearing.