M. Michael Potoker, J.
The District Attorney has applied to this court for an order directing the defendant (1) to furnish a voice exemplar; and (2) that this exemplar be of the words used on a tape which will be offered on trial.
In support of their respective positions, the District Attorney submitted a memorandum of law and both sides presented argument before this court on whether or not the constitutional rights of the defendant would be violated by the granting of such an order.
The People intend to use this exemplar for the purpose of making a voiceprint and then having it compared with a voiceprint to be made from another tape previously obtained by means of an eavesdropping warrant.
Defendant resists the People’s application on the ground that compelling him to furnish a voice exemplar violates his Fifth Amendment privilege against self incrimination and his Fourth Amendment right against unreasonable searches and seizures and his right of privacy.
Additionally, the court must consider whether it has sufficient jurisdiction over the defendant to make the requested order and whether the request of the District Attorney is reasonable under the circumstances.
FIFTH AMENDMENT
It has long been held that the compelled display of identifiable physical characteristics infringes no interest protected by the privilege against compulsory self incrimination (United States v Dionisio, 410 US 1, 6. “Both federal and state courts have usually held that [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling ’communications’ or ’testimony,’ but that *870 compulsion which makes a suspect or accused the source of 'real or physical evidence’ does not violate it.” (Schmerber v California, 384 US 757, 764.)
In Schmerber the Supreme Court held that the extraction and analysis of blood involved no "shadow of testimonial compulsion upon or enforced communication by the accused.” (Schmerber, supra, p 765.) The compelling of handwriting exemplars has been held not protected by the privilege against compulsory self incrimination in Gilbert v California (388 US 263, 266, 267). "One’s voice and handwriting are, of course, means of communication,” but a "mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside its protection.”
Similarly, the Supreme Court found no error in compelling a defendant in a robbery case to utter words, while in a lineup, that had allegedly been spoken by the robber. The defendant was thus "required to use his voice as an identifying physical characteristic, not to speak his guilt.” (United States v Wade, 388 US 218, 222-223.)
The cases of Wade, Gilbert and Dionisio effectively refute any contention that the compelled production of the voice exemplar would violate the defendant’s Fifth Amendment rights. Therefore, an individual’s voice may be taken to be examined as to its physical properties to aid in the identification of a perpetrator, but not for the testimonial or communicative content of what was said (United States v Dionisio, supra, p 7).
See also, People v Singleton (83 Misc 2d 112); People v Tine (App Term NYLJ, March 29, 1976, p 9, col 6; United States v Raymond (337 F Supp 641, affd sub nom. United States v Addison (498 F2d 741 [voice exemplar ordered and used with spectrogram analysis]); United States v Brown (No. 34383-72 [DC Super Ct 1973, 13 Cr L 2203]); State v LaCoste (256 La 697 [Trial Judge ordering defendant to speak in courtroom did not make defendant incriminate self, contrary to Fifth Amendment]); United States ex rel. Feldt v Follette 298 F Supp 1298 [defendant ordered to speak while in lineup — not so suggestive as to give rise to irreparable misidentification]); State r Vice (259 SC 30 [requirement that defendant speak into telephone so that his voice could be recorded for identification purposes did not violate privilege against self incrimination]); State v Spencer (28 Utah 2d 12 [defendant compelled *871 to participate in lineup and to repeat certain words — did not deprive him of Fifth Amendment right to remain silent or to be a witness against himself]); Biggers v State 219 Tenn 553 affd 390 US 404 reh den 390 US 1037 [defendant in rape case engaged in conversation by police in police station within hearing of victim — defendant gave no factual information to connect him with crime — all he gave was sound of his voice, to be used, along with other things, solely for identification— Fifth Amendment right not violated; lower court decision affirmed by equally divided court]); contra — (because of repeating exact words), State v Taylor (213 SC 330); also 24 ALR3d 1261 [voice test].
Similarly, People v Allah (84 Misc 2d 500 [dental impressions to identify bite marks]); People v Marx (Calif Ct App 2d Dist Dec; 19, 1975 18 Cr L 2457 [bite marks]); State r Williams (18 Cr L 2501, Minn Sup Ct Feb. 6, 1976 [compelling wearing of hat in courtroom so defendant could be compared with photo]); People v Mineo (85 Misc 2d 919 [taking of palm prints]); People v Yukl (83 Misc 2d 364 [ordering submission to blood test]); Matter of District Attorney of Kings County v Angelo G. (48 AD2d 576 [handwriting exemplar]); People v Schwartz NYLJ, April 14, 1976, p 9, col 1 [handwriting exemplars]); People v Omard (86 Misc 2d 151 [handwriting exemplars]); People v Sims (NYLJ April 27, 1976, p 6, col 4 [verbatim handwriting exemplars]).
Nor would ordering a defendant to speak require him to change his physical appearance as was required when a defendant was ordered to shave his beard for a lineup, not having been arrested for the crime under investigation (People v Vega, 51 AD2d 33).
FOURTH AMENDMENT
The Fourth Amendment guarantees that all people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures”. If there is a Fourth Amendment violation here it must rest on a lawless governmental intrusion upon the privacy of the "person.”
"[T]he Fourth Amendment protects people, not places” (Katz v United States, 389 US 347, 351).
The Supreme Court explained the protection afforded "persons” in light of the Katz statement, "wherever an individual may harbor a reasonable 'expectation of privacy’ * * * he is *872 entitled to be free from unreasonable governmental intrusion” (Terry v Ohio, 392 US 1, 9).
There are two possible Fourth Amendment issues; the initial "seizing” of the person to bring him into contact with the government authorities (see Davis v Mississippi, 394 US 721; United States v Dionisio, 410 US 1, 8 supra) and the actual obtaining of the voice exemplar from him — the "search and seizure” of evidence.
In the instant case, the defendant had been lawfully "seized” pursuant to an arrest warrant and the Grand Jury indictment upon which it was predicated. This gives the court jurisdiction to act with respect to the defendant.
The Fourth Amendment provides no protection for what "a person knowingly exposes to the public, even in his own home or office”. (Katz v United States, 389 US 347, 351, supra.) "The physical characteristics of a person’s voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man’s facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.” (United States v Dionisio, 410 US 1, 14, supra.)
The Court of Appeals for the Second Circuit, in commenting upon oral and written communication, stated: "The underlying identifying characteristics — the constant factor throughout both public and private communications — are open for all to see or hear * * * [N]o intrusion into an individual’s privacy results from compelled execution of handwriting or voice exemplars”. (United States v Doe [Schwartz], 457 F2d 895, 898-899.)
The taking of a voice exemplar is far removed from even the blood sample of Schmerber or the frisk of Terry. It "involves none of the probing into an individual’s private life and thoughts that marks an interrogation or search.” (Davis v Mississippi, 394 US 721, 727, supra; see, also, State v Cary, 49 NJ 343, holding that a prior showing of the admissibility on trial of the voice exemplar will be required before allowing the taking of this exemplar.)
This court finds that the defendant has not shown a valid objection to the District Attorney’s application on either Fourth or Fifth Amendment grounds, that the court has jurisdiction to act, and that the District Attorney has shown *873 reasonable and probable cause for the granting of an order for an exemplar of the defendant’s voice. Accordingly, said order for a voice exemplar is granted. To overcome any technical difficulties that may occur in the recorder, the magnetic tape, microphone, or recording level, the defendant is directed to repeat the text of his remarks on the tape twice.
The court further orders that two exemplars may be taken and may contain the specific words that were allegedly uttered by the defendant which appear on a tape that the District Attorney intends to offer into evidence at time of trial.[1] However, to avoid suggestiveness, the defendant shall not be compelled to take part in a dialogue with the tape transcript being used as a script. For the same reason, no person whom the People intend to use as a witness to identify the voice on the eavesdropping tape as that of the defendant shall be allowed to be present at the taping of the exemplar. Defendant’s attorney is authorized to appear with his client and be present at the taking of the voice exemplar.
The court, in ordering the defendant to provide a voice exemplar, does not do so in a vacuum. The District Attorney has clearly indicated the use he intends to make of the voice exemplar, that is, to have a voice spectrogram made and then compare it to a voice spectrogram of the eavesdropping tape. To allow these types of tests and examinations to be made without first making a preliminary decision as to the admissibility on trial of such evidence would be to propagate an exercise in futility and to allow an unnecessary intrusion upon the defendant.
There are three areas which the court finds must be examined before admitting into evidence testimony of a scientific process which, for legal purposes in this State, is essentially very new:[2] (1) relevant scientific and legal writing, texts and reviews; (2) judicial opinions from other jurisdictions; (3) evidence as to admissibility presented to the court by witnesses including the witness the People intend to qualify as their expert.
This court has carefully reviewed the first two areas and *874 will base its preliminary decision upon them. If, at the time of trial, the People are able to lay a sufficient foundation to satisfy the court that the expert whose opinion is sought is qualified to assist the factfinder in coming to a conclusion as to a voice identification, then he will be allowed to testify and give his opinion.
Simply stated, sound can be defined as energy in the form of waves or pulses caused by vibrations. In the speech process the initial wave-producing process originates in the vocal cords. If a sound wave strikes another medium, the energy from the sound wave causes the new medium to vibrate. The sound waves in the ear cause the eardrum to vibrate. The vibrating motion of the eardrum is then converted into impulses which are transferred to the brain and are "perceived as sounds we hear.”[3]
A spectrographic machine is a scientific device which receives sound vibrations and signifies its results by producing graphic patterns on a paper; said patterns are then the subject of analysis by an examiner. The spectrogram (the "display” of a spectrograph machine) displays three main parameters of speech — time (horizontal axis), frequency (vertical axis), and intensity (degree of shading in the time/frequency regions).
Lawrence Kersta, while working for Bell Systems (sound spectrograph machine result of research at Bell in 1941), adapted the spectrograph machine to the process of identifying humans by their voices. Kersta’s theory of voice uniqueness was based on the way the articulators interacted with one another and the vocal cavities. The articulators include the lips, teeth, tongue, soft palate, and jaw muscles. The vocal cavities are the throat, nose, and the two oral cavities formed in the mouth by the positioning of the tongue.
Kersta contends that the possibility of two individuals having the same dynamic use pattern for their articulators and having vocal cavities of the exact same dimension is remote. This theory forms the basis for being able to identify speakers by the spectrograms made by their voices.[4]
The spectrogram examiner listens to recordings of known and unknown voices and visually analyzes the spectrograms of each voice. If he finds sufficient points of similarity, he will *875 indicate that the two exemplars, the known and the unknown, were made by the same, person.
Before the court can allow the introduction of evidence based on a scientific test, preliminary proof must be given showing that the results of the test may be relied on as a substantial fact (29 Am Jur 2d, Evidence, § 823). This would include showing that the test itself has been established as accurate and reliable, as well as laying the proper foundation (Admissibility of Spectrograph Evidence, Ann, 49 ALR3d 915).
”[T]he thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” (Frye v United States, 293 F 1013, 1014.)
The case law in this area first began to accumulate in 1966. In an Air Force court martial a defendant was convicted of making obscene calls to two women. A spectrogram was used for voice identification purposes, and the conviction was affirmed on appeal (United States v Wright, 17 USCMA 183, 37 CMR 447).
Shortly thereafter, two State appellate courts considered the admissibility of voiceprint identification and rejected it, finding that it had not attained, at that time, sufficient scientific acceptance and proven reliability to be accepted into evidence (see State v Cary, 49 NJ 343, supra [affirming in part, remanding in part]; 99 NJ Super 323 [opn on remand]; 53 NJ 256 [murder case — voice on telephone]; People v King, 266 Cal App 2d 437 [arson case — voice on television of unidentified individual incriminating himself]).
One of the key defense witnesses in both cases was Dr. Oscar Tosi, a professor of audiology, speech science and physics at Michigan State University. Dr. Tosi testified he was impressed by the process, but felt further experimentation was necessary before he could give a firm scientific opinion.
Dr. Tosi then conducted an extensive two-year study in conjunction with the Michigan State Police Department,[5] and conclusively demonstrated the reliability of speech spectrograms as an aid in the identification of unknown speakers.[6] *876 When testifying in People v King (supra), Lawrence Kersta stated that voiceprints had "the infallibility of fingerprints.” Such a comparison was an exaggeration and has been used as a straw dog by voiceprint critics since that time.
Unlike fingerprints, speech spectrograms of the same speaker uttering the same sound vary from articulation to articulation. Consequently, analysis and comparisons of speech spectrograms among different speakers focus not on a simple matching or failure-to-match process as in fingerprint identification, but on the qualitatively more substantial differences in spectrograms produced by different speakers from those produced by the same speaker (See United States v Bailer, 519 F2d 463, 466).
There are other admissible forensic fields which are analogous to spectrogram analysis in technique and reliability. Many of these areas of scientific expertise commonly held to be admissible in evidence have been found to be as, or less, reliable than voiceprint identification. The analysis of hairs and fibers, for instance, while frequently forming the basis of expert testimony in criminal cases, is well known to be incapable of resulting in positive identification of compared substances.[7]
The identification of firearms by ballistics experts by way of microscopic examination of the striation marks on bullets fired from them is "common knowledge” and expert testimony as to such identification has been sustained in numerous cases.[8] Yet, bullets fired in succession from the same weapon, like spectrograms of identical words spoken in succession by the same speaker, do not possess identical characteristics.
In the area of forensic chemistry and serology, no test for detecting seminal stains is absolutely positive for semen. Nevertheless, expert testimony concerning seminal stains on the clothing or in the vaginal area of a rape victim is commonly held to be admissible.[9]
Although blood alcohol tests generally are not considered as conclusive of intoxication, nor even as to the alcohol content of body fluid, expert testimony as to such tests is not only commonly admissible in evidence, but numerous State statutes *877 have established presumptions that certain blood alcohol levels are presumptive of intoxication.[10]
Even though Kersta’s analogy between voiceprints and fingerprints was inapposite, it is abundantly clear that voice spectrogram analysis is highly reliable when contrasted with more analogous areas of forensic disciplines that are commonly admitted into evidence. [11]
Appellate opinions rendered since the completion of Dr. Tosi’s research in 1972 have almost uniformly ruled in favor of the admissibility of voice spectrogram identification testimony.
In State v Andretta (61 NJ 544), a case involving telephone threats, the New Jersey Supreme Court ordered the taking of a voice exemplar but refused to decide at that time whether the results of the tests would be admissible on trial. The court did, however, conclude, (p 551) "the significant scientific experiments and recent judicial acceptance of the voiceprint method since Cary [supra] convince us that the support for this method now rests on considerably more than the word of a single man.”
In State ex rel. Trimble v Hedman (291 Minn 442), voice-prints were used to establish probable cause for a search warrant. After quoting from testimony of Dr. Tosí and Dr. Peter Ladefoged, the court stated (pp 456, 457): "It is common knowledge that the opinion of an expert on an identification subject is seldom so infallible that others in his field do not disagree with him. But disagreement alone does not make the opinion inadmissible. Where experts disagree, it is for the factfinder, whether that be jury or court, to determine which is more credible and therefore more acceptable. * * * The weight and credibility to be given to the opinion of an expert lies with the factfinder. It is no different in this field than in any other. * * *
"In view of the fact that identification by aural voice comparison, either respecting telephone conversations or words spoken at a lineup, or recorded by other mechanical means is admissible, and the admission that voice comparisons by spectrograms corroborate identification by means of ear, we are convinced that spectrograms ought to be admissible at least for the purpose of corroborating opinions as to identifíca *878 tion by means of ear alone. They ought also to be admissible for the purpose of impeachment. The weight and credibility of such evidence lie with the finder of facts, but that does not involve the question of admissibility.”
In Worley v State (263 So 2d 613 [Fla]), Dr. Tosi again testified. Here the court found voiceprints admissible to corroborate the identification by other means (fingerprints on phone). See also Alea v State (265 So 2d 96 [Fla]), relying heavily on Worley and again using the voiceprint to corroborate other identification in a telephone extortion case.
The intermediate appellate courts of California have split on the admissibility of voiceprint identification. Hodo v Superior Ct of Riverside County (30 Cal App 3d 778) was a bribery case where the alleged bribe offers were made over the telephone. Identification was made by spectrogram analysis. Dr. Tosi, who had testified for the defense in King (266 Cal App 2d 437, supra), now testified for the prosecution. The court held (pp 790-791): "Thus, the record in the instant case indicates that since King voiceprint identification has received general acceptance by recognized experts in the field who would be expected to be familiar with its use and has therefore reached the standard of scientific acceptance and reliability necessary for its admissibility into evidence. An impressive area of other jurisdictions has so held.”
This ruling was followed in People v Watson (Cal App 3d Dist [1973]).
But the Fifth Appellate District (California) found the admission of spectrogram evidence error in People v Law (40 Cal App 3d 69). In this case, the defendant used a "mimicked” voice in making the exemplar, and the court found Dr. Tosi’s study "did not include trials with disguised or mimicked voices” (People v Law, supra, p 84).
Apparently, the only other appellate court decision refusing to accept voiceprint identification is United States v Addison (498 F2d 741, supra). The District Court in United States v Raymond (337 F Supp 641, supra) had allowed the spectrogram testimony into evidence based on its reliability and that the jury, being given the benefit of expert testimony on the subject, could give the evidence as little or as much credence as it saw fit. The Circuit Court affirmed the Raymond case in Addison (a codefendant in Raymond), but found error in the admission of the spectrogram testimony. Though the Tosi *879 study was not impeached on trial, the court still concluded, as had the court in Law, that voiceprint identification was insufficiently accepted within the scientific community to be admissible in court (United. States v Addison, 498 F2d 741, 745, supra).
The three most recent appellate decisions have either distinguished or rejected the Law and Addison decisions and sustained admissibility of voiceprints. Two of these decisions were decided by Federal appellate courts. In United States v Franks (511 F2d 25), the Sixth Circuit, taking note of Addison, stated that the (p 33) "trend favors, the admissibility of voiceprints”. The court then reiterated its ruling first enunciated in United States v Stifel (433 F2d 431, 438 [neutron activation analysis]) that "[N]either newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every useful new development must have its first day in court. And court records are full of the conflicting opinions of doctors, engineers and accountants”. The court noted that the process itself and the qualifications of the expert were extensively examined on trial. The Franks court, in considering the Frye (293 F 1013, supra) test of "general acceptance in the particular field in which it belongs” found that "general acceptance” is "nearly synonymous with reliability. If a scientific process is reliable, or sufficiently accurate, courts may also deem it 'generally accepted.’ ” (511 F2d 25, 33, n 12.)
In essence, the Sixth Circuit has modified Frye in much the same way the trial court did in People v Straehle (see 13 NYLF 745, 747 [Supreme Ct, Westchester County] see n 2, supra). In Straehle, the court used the "scientifically accurate” test to determine admissibility, with remoteness or unreliability used to determine the weight to be given the expert opinions.
In a unanimous decision, the Fourth Circuit upheld the admissibility of voiceprints in United States v Bailer (519 F2d 463, supra). In this case, the defendant was charged with making bomb threats. In ruling on the admissibility of the voiceprint process, the court said (p 466): "Unless an exaggerated popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury, it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation. United States v Stifel [433 F2d 431]; Coppolino v State, 223 So. 2d 68 (Fla. *880 App. 1968); see McCormick, Evidence § 203 at 490-91 (2d ed. 1972).”
The court further remarked that the Trial Judge’s instruction allowed the jury to reject the expert’s opinion if they believed it (p 467) "unsound or if contradictory evidence cast doubt on it.” This case therefore, as have other recent cases, allowed the jury to fairly weigh the spectrogram evidence and reject it if they saw fit.
In a very comprehensive decision reviewing the relevant scientific writings and legal opinions, the Supreme Judicial Court of Massachusetts upheld the admissibility of voiceprint evidence (Commonwealth v Lykus, 327 NE2d 671).
The court in Lykus stated (p 675) "neither infallibility nor unanimous acceptance of the principle need to be proved to justify its admission in evidence.”
The court recognized that the literature in the field, by those qualified to speak, was not unanimous in its approval of the technique used. "For the most part [the detractors] contend that the percentage of error will increase when conditions depart from the laboratory and are considered in the real world.” (p 677.) The court disposed of this opposition, basing its decision on Dr. Tosi’s testimony concerning the increased reliability of the examiner under forensic conditions. Dr. Tosi founded his conclusion on the following: (1) the examiner need not reach a conclusion (reduces error rate from 5-6% to 2%); (2) forensic examiner aurally compares voices and visually compares spectrograms (lab examiner only compares spectrograms); (3) forensic examiners have longer training than those used in the lab tests upon which his study was based; (4) the forensic examiner is under no time pressure to reach a- decision while the lab examiner had only 15 minutes per examination; (5) real life examiner may work with numerous samples of clue words, while the lab examiner only had six or nine clue words from which to make his determination (13 Am Cr LR, No. 2, pp 174-175).
The court in Lykus then concluded (p 678): "The considerable reliability proved by the Tosi experiment, the greatly added reliability induced by the application of further skills by the experienced examiner working under forensic conditions, and the totality of the evidence received at the voir dire hearing which tended to minimize the importance and weight of adverse or skeptical writings all serve to support a conclu *881 sion of general acceptability as required by the rule of the Fatald[12] and Frye cases.”
Addressing itself to the "general acceptability” test of Frye, the court in Lykus (p 677) recognized the dangers present when only a limited number of persons claim special knowledge in a field, yet still found that "the Frye rule is satisfied * * * if the principle is generally accepted by those who would be expected to be familiar with its use.”
The decisions of approximately 50 different trial courts from State and Federal jurisdictions have nearly unanimously reflected the acceptance of voice spectrographic identification following Dr. Tosi’s study. At the United States District Court level, 14 of 15 Judges who have ruled on the issue of admissibility have accepted yoiceprint evidence, while all but two of the 37 State courts which have reached the issue have held such evidence admissible. A single Canadian court which was confronted with the issue found in favor of admissibility of voiceprints.[13]
It appears to this court that the vast majority of Jurists at the trial and appellate levels who have considered the issues have concluded that voiceprint identification has "reached the standard of scientific acceptance and reliability necessary for its admissibility into evidence.” (Hodo v Superior Ct. of Riverside County, 30 Cal App 3d 778, 790-791, supra; see, also, United States v Wright, 17 USCMA 183, 37 CMR 447, supra; United States v Franks, 511 F2d 23, supra; United States v Bailer, 519 F2d 463, supra; Commonwealth v Lykus, 327 NE2d 671, supra; State v Reed, Md Cir Ct, Sept. 9, 1975, 18 Cr L 2011).
It is the opinion of this court that voice identification by means of visual spectrogram analysis, when accompanied by aural examinations and comparisons and when conducted by a properly qualified examiner, has now reached the level of general acceptance by those who would be expected to be familiar with its use. Voice spectrogram analysis has reached the standards of scientific acceptance and reliability necessary for its admissibility into evidence with ultimate consideration by the trier of the facts.
The consideration of such evidence by a jury must be *882 carefully shepherded by the court so that no undue weight is given to the methodology because of its relative newness in the legal area, and the jury must be given the opportunity to accept or reject the expert’s opinion, or give it whatever weight it so finds it deserves.
To reiterate, the order for a voice exemplar is granted. This opinion shall constitute the findings of the court on the admissibility of voice spectrogram evidence subject only to the qualification of an expert at time of trial.

. Suppression and audibility hearing previously held on this tape, and it was admitted into evidence on a prior trial of the defendant.

. People v Straehle, Grim No 9323/64, Supreme Ct, Westchester County, 1966; spectrogram identification testimony allowed in on trial — hung jury; indictment later dismissed (other grounds), 53 Mise 2d 512; see 12 NY Law Forum 510, 13 NY Law Forum 747.

. Scientific Evidence in Criminal Cases, Moenssens, Moses and Inbau, "Spectrographic Voice Identification”, ch 12, pp 508-509.

. Id. Moenssens, ch 12, p 512.

. See generally, Tosi, Oyer, Lashbrook, Pedrey, Nicol & Riggs, Michigan State University Voice Identiñcation Project, Voice Identification Research (LEAA Grant, No. NI-70-004, Feb. 1972).

. Greene, Voiceprint Identification: Case in Favor of Admissibility, 13 Amer Grim L Rev, 171,173-177, ns 10-22.

. Moenssens, Scientific Evidence in Criminal Cases, pp 357-358, 364, 378-380.

. Ibid., p 149.

. Ibid., pp 265-266, 289-290.

. Ibid., pp 291-294.

. Greene, 13 Amer Grim L Rev 171, 193.

. Commonwealth vFatalo, 346 Mass 266.

. Greene, 13 Amer Grim L Rev 171, 184-186 (footnotes contain complete listing of these cases).